Good morning, Your Honor. Terry Mundar, appearing on behalf of the Western Public Agencies Group and the Public Power Council. The petitioners have been granted 40 minutes, and we wish to divide our time as follows. I will take 15 minutes. Mr. Johnson will follow me with 15 minutes, and finally, Mr. Weaver will follow with 10. And if I end up with any time left over out of my 15, I'd like to reserve it for rebuttal. Okay, just to orient us, can you tell me, I mean, there's so many briefs, even after some of you obliged us by disappearing. There's still a lot of you folks left. There are. If any of you would like to leave also, that would be fine. It's starting to look like an attractive alternative right now, Your Honor. There's so many entities, and there's so many issues. Can you give me a hint as to what issues will be addressed by you? I will try to make it as crystal clear as possible, Your Honor. Let me start with the list right now. What issues are you going to do? My issue is the implementation of the Section 7B2 rate ceiling, which we discussed on Monday in conjunction with the REP settlement contract. Mr. Johnson will follow discussing the priority firm rate and the treatment of the direct service industrial customers. And I believe Mr. Weaver, I'm taking liberties here because I haven't spoken to him, will be talking to you about funding decisions made by Bonneville in relationship to fish mitigation efforts. Funding fish. All right. Pardon me? I see that is cut. There are a couple of other small issues. Okay, but that's the line up. That's the line up. Okay, thank you. You betcha, Your Honor. So, as I said on Monday when I was before you on the contract case, this case and that case are linked. And the linkage between the two is that both stem from Bonneville's decision as a matter of policy to increase the payments to the investor and utilities under the REP. I argued in that case, if you will recall, that the contracts that Bonneville signed, the REP settlement contracts, could not be performed by Bonneville consistent with their statutory duties. And I hope you will also recall that during that brief argument, Bonneville first argued that the REP settlement agreements were authorized because of Bonneville's extraordinarily broad settlement authority. They then changed their argument and asserted that those contracts were, in fact, in accordance with the statute because they accommodated the results of the Section 7B2 rate ceiling. That's right. They abandoned, if they had made an argument, they abandoned an argument that Section, the 2F, to ignore the commands of 7B2. Exactly so. 7B2. Exactly so. And I'm here today... They want to abandon that and come back to the earlier one. I guess that's up to them. I won't be able to keep up if they do, Your Honor. Okay. So I'm here to tell you that their assertion with regard to those contracts is simply not true. Bonneville did not accommodate the Section 7B2 rate ceiling results in the contract, and they did not accommodate it in the rates that they set in the rate cases before you this morning. What Bonneville did do is take the position that when the rep benefit amounts are established by settlement, as opposed to doing it via the statutory scheme, that the 7B2 rate ceiling simply does not apply and the preference customers are not entitled to any protection whatsoever under that statutory provision. That is the position they took in the proceeding below, and that is the violation of statute that we come here to get rectified. We believe that Bonneville made this decision as an error of law, and they did it by misreading the statute. Section 7B2 provides, in pertinent part, amounts to be charged for firm power for the combined general requirements of public body customers may not exceed. The amount charged may not exceed. That's what Congress said when they said we are establishing a limit for the preference customer rate. I believe this language is mandatory, and in that language, Congress set an absolute limit on the amount that Bonneville could charge public agency customers for rep costs. The express congressional intention for putting this provision in the statute was to limit the amount of rep costs Bonneville could legally charge public agency customers, and there is no question, none whatsoever, that in this case Bonneville failed to abide by that limit. I would like to, if I could briefly, read to you a quote from Bonneville's brief from page 109, because I think it's more instructive for you to hear in their own words how they described how they accommodated the 7B2 rate ceiling results in the rate case. And I quote, in BPA's 2002 rate hearing, BPA addressed the potential for settlement by first calculating a PF preference rate of 20.79 mils per kilowatt hour with full application of the 7B2 rate test. Full application. Then, still quoting from Bonneville, because of an expectation that IOUs might accept the settlement and not enter into rep contracts, BPA made two adjustments to the post 7B2 20.79 mils per kilowatt hour preference rate. A, Bonneville allocated to the PF preference rates the cost of the cash payment associated with the proposed settlement. And B, Bonneville allocated the net cost of the rep credit to the PF preference rate. And the punchline is the last sentence. The result was an after settlement PF preference rate of 22.33 mils per kilowatt hour. A lot of words distilled to its essence, your honors. What Bonneville is saying in this paragraph is when they did the section 7B2 rate ceiling comparison, the result, the limit, the maximum amount they could charge public utility customers that Bonneville calculated was 20.79 mils per kilowatt hour. Once they had that result, they then exceeded it. And they exceeded it by adding to that rate the cost of their rep settlement program. And by their own words, that caused the rate that they charged the preference customers to reach 222.33 mils per kilowatt hour. Or to put in plain English, if that's possible in this setting, what they did is they added $292 million to the preference customer rate above the limit that they themselves had calculated pursuant to section 7B2. The difference between 20.7 mils per kilowatt hour and 22.33 mils per kilowatt hour works out to $292 million? Yes, your honor, when you multiply it by the appropriate loads and do the normal. And over what period? It's a five-year rate period, your honor. So if you wanted to get the annual amount, you'd take the 292 and divide it by five. And just to make sure, what rate period we're talking about, this is the rate period for? That we're currently in, your honor. It started in 2001 and goes to 2006. Can you help me with parent B? There's a parent A you just described, I think. So you take the amount they're called the settlement cost and they spread it out over all the rates, including going into the rates of the preference customer. What's funnily equivalent with that characterization is there weren't many other rates to spread it to. We bore the bulk of the cost. Whatever rates there were, it went out over. And you guys pick up $292 million, according to the calculation you gave. I understand that part, I think. Yes, sir. It's always an I think in this area, I'm afraid. What about parent B? What's that mean? BPA allocated the net cost of the REP credit, a benefit not otherwise allocated. What's that refer to? Because you were describing the operation of A, really. I was, your honor. I just wanted to complete the paragraph so that I wouldn't be accused of leaving anything out. What's parent B mean? I believe that's a credit that actually reduces the impact of parent A by virtue of the fact that they have anticipated there will be no rep program under this statutory scheme. So there's sort of an offsetting credit there that causes the impact of the allocation of the settlement cost to be slightly less. It doesn't make it go away. It just knocks it off the end. An offsetting deal. Yes, indeed, your honor. Okay. So my characterization of this is that this is no accommodation of the 72 rate ceiling. It's a lack of application. BPA decided that because the REP costs were determined in a settlement, the Section 72 rate ceiling protections provided by Congress did not apply and simply set a rate that went beyond the limit that they themselves calculated. According to BPA, if BPA and the IOUs agree on any amount of benefits in settlement of its REP obligation, the public agencies have no protection. Section 72 does not apply, and they, the public agencies, are stuck paying the bill. Under this interpretation, the congressionally mandated cost protection provided to public agencies under Section 72 is erased by the mere expedient of a settlement agreement between Bonneville and some other third party. Counsel, can I take you back to page 110 where you were, that was the continuation of the paragraph which began on page 109 of BPA's brief. The BPA in there, and I don't know whether you read the sentence. If you did, it didn't strike me at the time. After they calculate, they end up with the 22.33 mils per kilowatt hour. The brief said that number was, not surprisingly in the case of the settlement, was higher than produced by application of BPA's contested calculation of REP benefits, which would be the 20.7 mils that you quoted. That is correct, Your Honor. But lower than produced by application of the IOUs contested calculation of REP benefits. That is also correct, Your Honor. So the IOUs were claiming that the 20.7 was a wrong number. Was there litigation over that? Was that litigation we heard on Monday, or was that some other litigation? That was, so we have to set the context a little bit in order to answer your question adequately. The contest over those numbers was conducted in a formal, on-the-record adjudicatory process conducted under Section 7I of the Act. That's how Bonneville sets its rates. It must do so in that fashion. They must make their decisions regarding the rates on the record, which it did in this case. What Bonneville did is it took under consideration the arguments made by the investor-owned utilities and found as a matter of law on each and every one of them in their final record of decision that they lacked merit. And so the quotation to the contested matters at the end of the rate proceeding, Bonneville made a decision, made it on the record, made it as a matter of law, and so those matters were decided. And the way Bonneville decided those was to sustain the 20.79 rate at the end of the proceeding. Is that the rate that then was litigated in this court where there was a decision last week that we were told about the other day? You'll have to rephrase that question. I'm not sure I got the— Well, the other day we talked about what the 7B2 rate or figure was. Yes, sir. And I think if I understood it correctly on Monday, we were told whatever that figure was that it had been challenged in our court and that a decision had been issued the week before. No, I think what you were told—that's almost 90 percent correct, Your Honor. You were told all of that up to the point where a decision had been rendered. What happened last week is the IOUs, if my understanding is correct and they can correct me if I'm wrong, voluntarily dismissed their challenges that I've referred to here that had been pending in this court. Okay. So are those the same challenges that Vibey was reading about with the contested rate? Yes, they are, Your Honor. That contest is over? That contest is definitely over as far as I'm concerned. The IOUs lost that contest. So I want to be careful how I answer that because I want to make sure I'm accurate in my answer. They lost those issues at the administrative proceeding level. Bonneville decided on the record adversely to each and every one of those claims. They then took an appeal to this court. Which has been dismissed. Which has been dismissed, I believe, voluntarily. By the IOUs? By the IOUs. And do we have a record of that or can we ask that somehow? Yes, there is an order of dismissal that we can provide to the court if you wish to see. That would probably be quite useful. Kevin, do you know what the IOU's contested calculation of RET benefits was? Do you know what figure they were using? I'm sorry. Ask again, Your Honor. On page 110, when BPA refers to what the IOUs wanted the RET benefits to be, do you know what mils per kilowatt hour the RETs were asking for? I believe it's the number that's cited there. In other words. The 22.33? Let me see. That can't be. No, that would not be correct. Let me see. I can't find that readily on the page. But I believe it was in excess, obviously, of the 22.33. How much in excess I can supply you? I'm going to repeat back to you what I thought I heard. Let's see if I've got this correct. I want to make sure that I understand your position. Your position is that Bonneville arrives at a rate of 20.7 mils per kilowatt hour. That the RETs asked for something higher than 22, something in excess of 22 mils per kilowatt hour. That BPA adjudicated that challenge. And in that adjudication decided to reject the RETs' position and reaffirmed its 20.7 mils per kilowatt hour. That's correct. In some other proceeding, as a matter of settlement, it then included additional costs, which gave it a figure of 22.33 mils per kilowatt hour. And as part of its settlement authority then settled with the RETs at that figure. No, that is not correct. I believe what happened is in the same proceeding, although they rejected the arguments of the IOUs with regard to the appropriate level limit that should be calculated under Section 72, and those arguments were rejected by Bonneville, Bonneville then essentially in the same proceeding turned the page and said even though we have calculated a rate correctly limited as to 72, which would be the 20.7 mils, we are going to nonetheless add another $292 million to that rate to take it up to the 22.33 level because it is our position, Bonneville's position, that when its payment obligation under the RET is settled, that the limitations that flow from Section 72 rate ceiling simply do not apply. And so they can essentially set a rate without regard to those limits if they denominate the cost that they put into that rate as a settlement cost. Does it say expressly anywhere that we do this for that reason, that we have concluded the 7B2 limits don't apply and we may exceed them? I believe the quote I read to you is as close as I can find that they've said that, and I believe that is their position. Now, you said this was done in a seven-parent I. Sorry about this. I'm looking at my colleagues. I assume that was done in an ROD, and what was the date of that? I'm sorry, Your Honor. The proceeding you're indicating, I believe it was. It was what is referred to as the May rod, but I can get you the precise date. It's cited in the very front of most of the briefs, and so it's a momentary thing to get it for you. I just want to make sure I've got all my pieces. Yes, it's important to have the facts. I'd better let you leave us so that you're... I would like, if my colleague will not react too violently, I would like to take just about two minutes to give you a summary that hopefully brings together the picture of both the case on Monday and today's case. You may use your term however you decide. Thank you. I appreciate that. What you heard on Monday was the case about Bonneville striking an arrangement with the investor and utilities to determine how much money they would be paid under the rep. That was the settlement. That was the part where Bonneville and the IOUs determined how much money would change hands. That's the how part of it. But that was only half the story, Your Honors. The case today is the other half of the story, because Bonneville, once having undertaken that obligation, had to come to the rate case to find somebody to pay the bill because Bonneville can't pay it itself. When they brought that $140 million obligation that they had undertaken to the rate case, they looked around, and guess what? The only folks left standing to pay the bill were the public agency customers. Bonneville, appropriately, ran the rate test, made the comparison, and determined that the rate that those customers could pay under 7b-2 by law was limited to 20.3, I'm sorry, 20.7 mils per kilowatt hour. That they did. But that only generated $48 million to pay the IOUs for rep benefits, because if we're the only ones to pay, no place else to get the money, 7b-2 is the pinch point. It limits what Bonneville can pay because it limits what it can charge us. And so what happened was Bonneville, at that point, made an error of law. They decided that they could, in fact, charge us more than the limit established by 7b-2 if the costs that they put into our rates were denominated as settlement costs. That is what they did. They added the money to our rates and charged us more than 7b-2 authorized them, according to their own calculation. That error of law permeates the rate case, and that's the error that we wish to have rectified. It also permeates the contract that we spoke to you about on Monday because it was the same error of law that convinced Bonneville that it could sign a contract, a settlement contract, with the investor on utilities, which included an obligation to pay them money, which exceeded Bonneville's ability to collect lawfully from us. And that is the whole picture of what's happened in this case. The last thought I would like to leave you with before I come back and give you the information that you asked for is if I were to commend to you one case to look at to decide this particular matter, it would be the MSR Power Agencies case versus BPA. In that case, this court overturned a Bonneville decision, and it did so for three reasons. First, because it found that Bonneville acted contrary to the clear and expressed directions of Congress. Second, because what Bonneville did flew in the face of overwhelming legislative history. And third, their interpretation converted a large part of the statute into surplusage. And I believe that is exactly what's happened in this case. And I appreciate the time, Your Honors. Thank you, Judge. I'm going to assist myself with a stopwatch. Good morning, Your Honor. My name is Eric Johnson. I represent the petitioners in docket numbers 0373707 and 0470382. Who is it that you represent, DSI? Pacific Northwest Generating Cooperative and its members, Rural Electric Cooperative Distribution Utilities, members of the Public Generating Pool, which is an association of municipal- Okay, are you PUDs or IOUs or DSIs or somebody else? We are preference customers. My clients, Your Honor, fit into the same customer class as Mr. Mundorf's clients. Okay. So you're sort of not only PUDs, unless you want to introduce a new set of acronyms for it. Co-ops. Okay. My clients are the co-ops. Good. All right. I mean, I've got so darn many pieces of paper floating around here. Which of the many blue briefs did you write? I wrote the brief filed by Pacific Northwest Generating Cooperative and the Public Generating Pool. You'd better start talking. Thank you, Your Honor. I'm with you. Sorry to be so slow. Anything I can do to help. Your Honor, this case is also about Bonneville's wholesale power rates for the same customer class as Mr. Mundorf was arguing before. There are many small utilities in that class. The complaint that we have is that Bonneville included a different category of costs in our rates and that this category was also unlawful. This customer class is also known as the preference and priority customers. Under Section 4A of the Bonneville Project Act, Section 5A of the Regional Power Act, we are entitled to preference and priority in the allocation of access to the federal-based system resources. I'm the guy that asked the clerk to give you these pages from the Regional Power Act and the Bonneville Project Act. The first page is Section 5A. This section subjects all of Bonneville's power sales at all times to the provisions of Section 4A of the Project Act, among others. This is preference and priority explicitly made applicable to all sales under the Regional Power Act. The next page is Sections 4A and 4B of the Project Act. This is the statute that authorized the formation of EPA in 1937 as the marketer for the power from the first federal dam on the Columbia system. The Bonneville Project. Since that time, there have been many other federal dams constructed on the Columbia and its tributaries. Section 4A, and I've highlighted this in yellow to draw your attention to it and underline the language that I'm trying to specifically focus your attention on at this time, says that the facilities for the generation of power are subject to preference and priority. Section 4B says that when there are competing applications for an allocation of power from these resources, the preference customers, the co-ops, the PUVs, and the municipal distribution utilities are entitled to be served first from those resources. We have priority in our right to an allocation of the power that is generated by these resources and we are entitled to be considered ahead of the aluminum companies who are not preference customers. Now, in rate making, there's a further direction which is on the next page, 7B1. Section 7B1 is the fundamental rate directive that Bonneville has to observe in making rates for the preference customer class. It starts on the bottom of the third page of my package and continues on the next page. You'll see I've underscored a couple of references there. We are supposed to pay the cost of that portion of the federal-based system that is used to serve our loads. And if Bonneville is short and we need to buy more power, we pay the cost of additional power purchased to serve our loads, not somebody else's loads. Now, in 1980, when Congress passed the Regional Power Act, it struck a great many imbalances and compromises. One of those compromises was to try to provide for a period of 20 years a balance between the needs for allocations of power by the several customer classes, the preference customers, investor-owned utilities, and the direct service industrial customers. The DSIs are a historical group of companies, mostly aluminum producers, that purchased very large quantities of electricity from Bonneville. For 20 years, Congress made a statutory allocation, and it deemed Bonneville to have enough power to serve everybody. It authorized Bonneville to purchase more power and blend the cost of that power, meld it into the rates that were paid by the customers that were given an allocation by Congress. That statutory allocation expired on September 30, 2001, the last day before this rate period. After that time, the aluminum companies, the direct service industries, had no right of access to the federal-based system. Under the preference and priority statutes that I've tried to draw your attention to, Bonneville had enough power to serve the preference customer class. It did not have enough power to serve the direct service industries. Bonneville violated Section 4A of the Project Act, Section 5A of the Regional Act, the preference and priority provisions, and the rate-making directive, the 7B1 of the Regional Act, by including the costs of wholesale market power purchased because it wanted to serve DSI loads in our rates. Those costs were unlawfully incurred, and they were unlawfully included in our rates. Bonneville makes a great many arguments in defense of its decision. We don't think any of them hold water. There's a large number of issues that are addressed in the briefs, and at this point what I would propose to do is to stop here and ask if you have questions of me. I want to make sure I understand this. It's your contention that whatever need the preference customers have, the BPA must satisfy that first before it sells anything else. Is that without limitation? So you may get whatever you want from them? We get whatever our net requirements are. That is, some of the preference customers have their own generating resources. The small dams have larger dams. Some of them have landfill gas methane plants. My client has one of those. Bonneville is obligated only to serve the net requirement, but preference customers have dibs under the statute. They have always had that. The Regional Power Act emphatically and expressly continued the preference and priority provisions, and that means Bonneville is supposed to offer us power before, not simultaneously with an offer to the aluminum companies. They are also not supposed to include costs of serving aluminum companies in our rates at 71. This is the core of our case. We think the statutes are extremely clear. The rest of the argument in the briefs is about how Bonneville sought to get around this. I asked this question on Monday of a different lawyer. Let me ask you this question and see if I can find out something. It seems to me at least the following is not seriously in dispute even with Bonneville, that they're pushing this statute, whether they're violating it. I'll leave for the moment in dispute. Why are they doing this? Why are they deciding to lean on you guys in favor of the DSIs and the IOUs? I can only speculate to some degree just briefly with regard to the IOUs because that's Mr. Lundar's topic. It's my understanding that the IOUs took the view that for a number of years, their benefits under the residential exchange program, the REP, were insufficient and unfairly low. They wanted a better deal for this rate case, and they pushed very hard to get it. With respect to the direct service industries, the largest remaining among them is Alcoa,  Alcoa's production in the United States, I believe, is unionized. The employees are represented by the United Steelworkers. The United Steelworkers had considerable pull with the Secretary of Energy under President Clinton, and Alcoa, if not also the Steelworkers, had influence with the Secretary of Energy under President Bush. I filed a request for judicial notice recently. I've asked you to look at the fact that Bonneville has already decided to provide substantial financial benefits to the DSIs and to charge the cost to us. They're going to do it again. My belief is that this is direction from high up in the Department of Energy given to EPA. There is little or nothing in the administrative record, as you might suspect, that would show this. But these were the rumors. We tried to do a little bit of discovery by requests for data in the rate case, but there wasn't enough risk. So what I'm telling you in answer to your question is really informed speculation. I don't think Bonneville denies that they were told to serve the DSIs on favorable terms. I don't attribute bad motives to any of the persons at Bonneville who made these decisions. Our view is that they simply violated the law. The statutes are, in our view, very clear. None of Bonneville's justifications can sweep away these express and specific limitations on what they can charge us and the sources of the power that they're supposed to sell to us. I'm going to jump quickly to my issue of the remedy. Normally in a case like this, if the petitioner prevailed, the court would remand it with instructions to the agency. The next rate case has already started. They've made a decision to serve DSIs, provide them service benefits, and charge those costs to the preference customers. That's the June 30 record of decision that I sent to the court. We don't know what the outcome of the rate case will be, but Bonneville has said in its Federal Register notice that these issues are off-limits. We cannot litigate in the rate case whether they will provide benefits to the DSIs or where the costs will be allocated. I hope I said that right, but I believe those decisions are fixed and the agency will not entertain argument in the rate case. I filed a petition for review at the end of September in hopes of preserving the right to litigate the execution of contracts by which Bonneville would serve the DSIs. Once the contracts are signed, Bonneville will say, we've got contracts to sign, we must perform them, and we have to go out and buy power to serve them. Every month that goes by makes it more difficult for us to prevent this from recurring. And so I've asked the court to consider granting an injunction against this kind of activity when it issues its decision. And the reason you're saying that you want that remedy is, do you think that a chargeback is not practical because there are not enough rate payers out there that are non-preference customers to make up the damage that you claim you've suffered? That's true. In the DSI contracts, Bonneville essentially agreed to exempt them from any kind of a refund charge. The contracts have a provision that says if there is a remand order from this court, they can exit. The DSIs can walk away from their current contracts. Bonneville would have no DSIs to impose a surcharge on for the balance of this rate period, which, by the way, is only about ten and a half months. We're almost done with the five-year rate period that this is for. We've already paid these costs. We don't think that we can get them back. The IOUs didn't violate the law in this regard. It would not be right, in my estimation, for the IOUs to have to pay this back. Bonneville is a self-funding agency. They would have to go to Congress and get an appropriation to pay the refund, or they would have to charge us to refund money to us. So your argument is essentially a classic irreparable harm argument. Yes, Your Honor, it is. And there is repetition that is already underway. Thank you, counsel. May it please the Court, I'm Tim Weaver. I represent people who actually think DPA set their rates too low. I represent the Yakama Indian Nation and the Umatilla Tribe Treaty Indian fishermen who rely on the unanimous resource of the Columbia River. I need to address just a couple of procedural matters very quickly. I shudder to get into the morass of who filed what when. But FERC, in their brief, has raised the point that my clients did not file, timely file a petition in this case, citing a petition, kind of a belt and suspenders petition that was filed by my co-counsel in December of 2003. They don't discuss, or we filed a petition within three days of the FERC re-hearing order, which was, I believe, entered on October 17th. We filed on the 20th. I think our case law is actually fairly clearly in your favor on this point. Pardon me? I think our case law is fairly clearly in your favor on this point. I think it is, too. I just wanted to make certain that that didn't get missed. The second issue FERC raises is that my clients didn't raise, procedurally raise, the issue of multiple misses of Bonneville on their treasury payment in our motion for reconsideration. And I just want to call the Court's attention to pages 11 and 12 of our reply brief, where we raised all sorts of issues in that regard, and also in our opening briefs. We reserved that issue when we filed our petition for reconsideration and also the initial petition with FERC. I don't think those issues are before you, or at least I think we prevail on those issues. Our major concern with both FERC's first decision and with BPA's decision is that they relied only on the good, didn't look at the bad, and certainly never talked about the ugly. We challenged FERC's decision as being arbitrary and capricious, a violation of law, because Congress made it very clear that they had to make a finding under 7a, 2a, and 2b, not discuss, not think about, not mention, but make a specific finding that BPA's rates are sufficient to assure repayment of the federal investment in the federal Columbia River Power System and to make certain that those are based on the administrator's total costs. Now, FERC says, well, we did that. And they refer you in their brief to what they consider to be their finding. And what they say, and I'm quoting from their brief, is the proposed rates were intended to recover the annual revenue requirements of the generation function, including the federal investment in the hydro generation and fish and wildlife recovery. They don't say they're going to get there. They don't say we've looked at the record. They don't say that we've considered anything other than Bonneville's statements that they say these rates are good enough. We don't think that raises to the level of what Congress intended FERC to do, which was the legislative history is very clear, very clear in the act, that BPA was not to receive a subsidy in this situation. If they were to pay their debt, and they were to pay their debt based on their current costs and their rate schedules. FERC does not make that finding. FERC does not discuss those issues. And, in fact, simply rubber stamps BPA's rates. BPA, it's our position that BPA did the same thing, but I want to talk about what I think, at least from my client's standpoint, is probably the single most important issue here as to this rate case. Section 7I of the Northwest Power Act says that BPA will set its rates in the rate case and that it will give everybody a fair shot to come and rebut the information that it puts forward. What happened here, and our major concern, our major concern, and I think it's clear to you from our briefs, is what did BPA determine was going to be its fish and wildlife costs and was it going to be able to meet those costs? What BPA did, rather than making that determination in the rate case, they adopted what they claim is an independent outside discussion of what these costs were going to be, and they had 13 fish and wildlife principles. Now, in fairness, my clients participated in that process, and we did have a spirited debate and we did have a discussion as to what those fish and wildlife costs were. Could you try to do it in another two minutes? I'll do my best, Your Honor. This is kind of like my clients always end up with. Everybody else gets our time and some of our fish, but yes. The issue is what happened in that regard is, as Mr. Johnson was saying, about his client's problem with BPA making determinations outside the rate case and then saying, sorry, you can't challenge them, that's what happened here. If BPA took these principles, adopted them, or said they would adopt them, ultimately the record's clear, they ultimately changed them in the rate case, and then told my clients and everyone else and instructed the hearings examiner in that case to not consider any evidence to the contrary. We presented voluminous evidence that BPA was going to miss the treasury payment if they didn't set their rates high enough to cover the fish and wildlife costs in this situation. They totally excluded the evidence, refused to give us our opportunity to be heard and have a discussion as required under 7I of the Act, and as a result we've ended up with a situation where no one has adequately considered either BPA or FERC whether or not Bonneville's rates were set high enough to actually meet the fish and wildlife costs that they were facing. I think we've set this out adequately in our briefing, and if you have some other questions, I think that the bottom line here is when you look at the record and you look at what BPA has done and what FERC did, is they based their entire record on the fish and wildlife costs, on the good assumptions, and ignored, and as a matter of fact excluded, consideration of not only my clients' concerns about their ability to meet their costs, but also the Oregon Public Utilities Commission, who says there's a very good chance, even though BPA says it might meet its treasury payments 82 or 84 percent of the time, the flip side of that is during the 15 to 20 percent of the time, if they miss it, based on their own information, they may miss two or three or four payments during that period, clearly violating Section 7A of the Act. So it's our position that BPA has clearly, and FERC have both, been arbitrary and capricious and violated the law in dealing with the fish and wildlife costs. Thank you. Good morning. Good morning, Your Honors. My name is Beth Pacella, and I represent the Federal Energy Regulatory Commission this morning. I'm going to argue for eight minutes. Counsel for BPA, my opinion, is to argue for 27 minutes, and BPA's intervener counsel will argue for the remaining five. FERC agrees with the tribes. Oh, let me point out again, FERC issues only relate to the tribes' brief, and only the FERC matters raised in the tribes' brief. So our part in this case is pretty small. And we do agree that while the tribes' brief initially only relied on its second hearing petition in a statement of jurisdiction by the Court of Jurisdiction, they did point out in their reply brief that they did file their first petition, which was within three days of the hearing request. Excuse me, the hearing order. And therefore, there is jurisdiction to address the tribes' matters in the court this morning. So jurisdiction is not a question. Jurisdiction regarding the tribes is gone. Exactly. And I wanted to make that clear as well. There is, however, still the matter that BPA raised regarding jurisdiction in their brief based on FERC's ability. They basically asked for an advisory opinion from the court, contrary to the court's longstanding precedent that this court's jurisdiction to review FERC review of BPA matters is under the FTA, not under the NTA. And therefore, the BPA order has become final upon FERC's hearing. And I don't know if the court has any questions on that. Otherwise, I'll just move to the tribes' merits argument. Thank you. Okay. If you look first at the initial order, the July 2003 order, which is in FERC ER-127, it begins. Paragraph 15, which is on FERC ER-130, specifically says that, quote, Bonneville's power repayment study indicates the revenues expected to be collected under the proposed rates will be sufficient to recover Bonneville's total system cost. So even in this first order, there is a total system cost finding. Again, in paragraph 15 as well, the commission explicitly finds that Bonneville's proposed rates are consistent with 7A2A and B of the Northwest Power Act, meaning that all costs will be recovered, that they're based on total costs, and that payments to the treasury will be made in full and on time. And the same goes as well for the rehearing order. FERC goes even farther. One of the things the petitioner argues only based on the first order is that FERC relied only on the power repayment study. But that's not true. And that's clear, again, from the rehearing order, which begins on FERC ER-153. If you look at paragraph 3 there, FERC is quoting, essentially, directly from the revenue requirement study, talking about the costs that are intended to be covered, what the total costs are. And in paragraph 4 is, again, essentially quoting from the revenue requirement study and is talking about what those total costs are and how repayment is going to be made in full over a 50-year period and annually during the five-year rate period. I would also refer the court to paragraph 9 of that order on FERC ER-154, in which the commission specifically said that it finds that the data provided by Bonneville supports the commission's conclusion that the rates will be sufficient to recover costs and to assure repayment to the treasury. Unless there are any questions, I'm going to leave the remainder of my argument time to the EPA. Thank you. Thank you. May it please the Court. Good morning. I'm Kurt Gustav. I saw you earlier on Monday, representing Respondent Bonneville Power Administration. Our jurisdictional position is dated in our brief. I won't go any further than that for purposes of today's argument. I'm very limited on time. Also, I wanted to make a housekeeping note that Canby Utility Board and BPA filed a motion with the court to ask the court to consider BPA's rightness argument in this case. There's a later case, the Public Power Council versus BPA case, addressing the same issues. And so we're not presenting an oral argument on the merits today. I just wanted the court to be aware of that. I know that Canby has decided not to argue today, but that question of rightness is still before us? Yes, Your Honor. Yes, Your Honor. Turning first to 7B-2, there are a few things I'd like to note. One, our positions were mischaracterized by Mr. Mundark. We believe that we did act in 2F authority on the contracts. That's a separate case. And also that we went through all the different criteria of 5C when we came up with the considerations. Let me understand, because here's what I understood you to have said on Monday, and if I'm misunderstanding it, now is your chance to tell me. I understood you to have said that your settlement authority under 2F does not give you authority to disregard what would otherwise be applicable limitations coming out of 5A and 7-2B. Is that correct? That's correct, Your Honor. And we're consistent. And that settlement authority only allows you to settle things entirely consistent with the otherwise applicable statutory limitations. That's right, and we're absolutely consistent with both those, Your Honor. Absolutely. In other words, and if we decide that those settlements, and now going back to Monday, if we decide that those settlements are not permissible under 7-2B, for example, you lose. That would be correct, Your Honor. Okay. John. Okay. First of all, with regard to 7-B-2, let me stick with what you just said, because you brought up the case on Monday now. The contract did not preclude 7-B-2 from happening. It happens in every rate case. What happens is, with a settlement, BPA doesn't have the exchange load anymore. Therefore, your rate making is affected. But, for example, when you do 7-B-2, the DSIs can go bankrupt. The IOUs could be, there may not be an active residential exchange program. There may not be any load. When 7-B-2 triggers, and it can trigger in the absence of the exchange program, when that triggers and there's no load to allocate it to, what do we do? Well, the statute tells us what to do. We look to Section 7-G, and 7-G says, for all those costs not otherwise allocated under Section 7, you allocate them equitably to power rates. And the settlement costs are costs that are not otherwise allocated under Section 7, and that's why we allocated them to other power rates. Okay. Stop there, Counsel. We're running a little fast here. What you're saying, then, is that costs in excess of the 7-B-2 cap paid as a settlement could be charged under 7-G equitably against all of your customers. Is that correct? Let me explain how it works, Schreyer. BPA did, in fact, run the 7-B-2 rate test in this rate case. Ran the whole thing. We found a trigger occurred. We gave the preference customers a credit to their rate of $647 million. Okay. Now, they want you to look at this as 7-B-2 being a point, but $48 million is what BPA came out with in the rate case. So that's all 7-B-2 is. 7-B-2 is not a point estimate. It is a range from $48 million, where BPA takes its tough litigation positions against the IOUs and says, hey, come sue us if you want more. And on the other hand, the investment utilities litigation positions will say, look, you've been shortchanging us for years. You owe us over $300 million. And so we were able to reach a settlement at $140 million. So in the rate case, what happened was we ran 7-B-2. There was a trigger. We reallocated. We credited the preference customers, lowered their rate by $647 million. They want to stop there. You can't stop there. We have the settlement costs, $140 million a year we have to recover. Section 7A of the Northwest Power Act is the preeminent, overriding, most powerful provision in Section 7. If we don't recover our costs, FERC can't approve our rates. We don't have rates. That comes above everything else. And so when you have a situation, which can arise, where you're in a situation where you're not going to be able to recover those costs, you have to use a 7-G allocation. Let me read 7-G to make sure I understand it. I'm just reading the text of it. Except to the extent that allocation of costs and benefits governed by a provision of law in effect of December 5, 1980. I'm not sure that affects us. Or by other provisions of this section. The administrator shall equitably allocate the power rates in accordance with GAP, generally effective rate-making principles, and provisions of this chapter, all costs and benefits not otherwise allocated under this section. That's right. Including but not limited to conservation, fish and wildlife, uncontrollable venture reserves, excess costs of experimental resources. Well, what does that mean, not otherwise allocated under this section? It looks like 7-G, if I can use the term, is kind of a catch-all. Absolutely. That's our argument. It's for leftovers. That's our argument. And you say a settlement cost is a leftover. That's right. It's Section 7. So that's how the end run works. I got it. That is to say, anything that I pay out, whether it's authorized under 7-B to anything else, that gets allocated under 7-G. Whether I have any other authority to do it or not, 7-G allows me to allocate it. 7-G is not that free-willing, and we don't apply it in that free-willing manner, Your Honor. But that's, I think, what you just did with respect to these settlement contracts. No, that's incorrect, Your Honor. That's not what we did. 7-G does two things. First, there are certain 7-G costs that under 7-B2 are excluded from the program case. Separate issue. Second, in Section 7, it talks about costs that are not otherwise allocated under this section. There are FBS costs are specifically allocated to certain rates. New resource costs are specifically allocated to certain rates. So what 7-G says is that for those items that don't have a specific allocation, that is the catch-all provision where you allocate those costs equitably. We still have to do 7-B2. We did 7-B2. We got a trigger. We allocated it back to preference customers. Has BPA ever read 7-G in this fashion prior to this little complex of cases? Yes, since 1984, which would make it about 21 years, Your Honor. In our legal interpretation of 7-B2 in 1984, in our implementation methodology, we said exactly this kind of situation can come up. What do we mean by this kind? I use this kind for settlements. Oh, no, no. It doesn't address settlements. That's my question. Now, have you ever used 7-G prior to this cluster of cases with respect to settlement grants or settlement agreements? I don't think there's ever been circumstances where it would be applicable. So that would be the reason why. So, in other words, this is the first time. This is the first set of circumstances that would require it to be considered. Have you ever settled cases before? Ones that fell within the rate period itself, which means they don't carry over past a rate period. Previous settlements were generally lump sums or monthly payments that occurred within a rate period. So when they're paid within that rate period, they don't carry over into the next rate period when the next rates are set. So it doesn't come up in the next rate case. So it doesn't have to be addressed. So, no, it hasn't been addressed for that reason in prior rate cases. Okay. This settlement cost, let's assume for the moment that it does come under 7-G. Who do you allocate it to then? Everybody? All the rates. So the non-preference customers with whom you're settling, they'd have to pick up part of the settlement cost. Some of them. That's why we had to, you know, treat this very, very carefully because it's a situation that's very difficult. 7-G-2 is very complex. And when you have a settlement, you don't have the old exchange. And so it brings new circumstances in that we haven't addressed normally. How do we accommodate the fact that we have that settlement? That's what I don't understand. Either you've got to put it all on the non-preference, I mean all on the preference customers, or you've got to make the non-preference customers you're settling with pick up part of their own settlement. Well, the important thing that we had to do was not allocate costs back to reduce what the deal was. We had an existing settlement.  This is a very detailed rate-making kind of cost allocation issue. As Mr. Lundorf said, the majority goes to their rate, but there are other rates that get part of it, Your Honor. So what BPA did is when you settle things, you settle the kind of things that are ordinarily covered by 7-B-2. Whatever the factors you're settling are things that if you didn't have a dispute over it, it would be within 7-B-2. If the residential exchange program is active, then those costs are reflected in 7-B-2. And so if you make a mistake in it, then it becomes a settlement cost. Well, no. Here's the problem, Your Honor. When we've set these rates, this is part of the problem. This is why it's so difficult. We work so hard to do it right. At the time we developed the rates, we didn't know which contracts the IOUs were going to take. Oh, yes, you did. That is to say, the RAPs were losers and the settlement contracts were winners. Well, the IOUs, if they took the RAPs, would have to sue us to get more benefits. But they had a bigger upside. They'd get over $300 million a year. Did any IOU take the RAPs? No, they didn't. No surprise. But that was not as clear-cut a decision as you might think, Your Honor, because there are a lot of factors they have to consider when they make that decision. And that's their business judgment. So when we came in, we knew there was the residential exchange possibility where they could get up to over $300 million a year. And we knew the litigation issues were tough because we'd seen some of them before. We also knew they could take the settlement route. And if they took the settlement route, then we have to have rates for that, too. So how do we deal with these two possible worlds? It's something we've never had to deal with before in 7b-2. So what we did is, because 7b-2 incorporates the exchange, we ran a 7b-2 rate test, assuming an exchange, because that could occur. And we credited $647 million back to the preference customers, low in their rate. Then we had to look at what the settlement costs were. And then we allocated those costs under 7g to all rates. What happened as a result of this was that, as Judge Bybee pointed out earlier, and you're right on the money here, what happened is, if petitioners were writing just a point estimate of what BPA finds, then it's $48 million of benefits, but it's a range, not a point estimate. So there would have been this 20.79 rate if BPA won on everything in the subsequent litigation. Now, there's also the rate that's much, much higher. I'm sorry, I interrupted. If they won on everything in the subsequent litigation on the assumption that they accepted the RAP? When you say subsequent litigation, what's the subsequent litigation? Yes, Your Honor. If they don't accept the RAP, there's no litigation under your reference here. Right. I'm talking about the RAP. That's right, Your Honor. So the only litigation possibility you're now referring to is litigation possibility, assuming they're taking the RAPs, which none of them, in the end, took. That's correct, Your Honor. That's correct. I'm sorry. I don't mean to interrupt. Okay, but the 20.7 is a point. It's the low end. Okay, but it was a point, and unless you're going to dispute what Mr. Mundorf said, BPA adjudicated that, rejected the IOU's challenges to that, and reaffirmed the 20.7 point. In the RAP case, that was our litigation position because we wanted to be tough. We knew we'd be negotiating with the IOU's, and they'd want as much money as they could get in the settlement. We take tough positions in the RAP case, show low benefits, and they're a better bargaining position for when we negotiate those agreements. Now, we knew that they could win on some of those issues, and those benefits were going to go up. But that was our low point estimate based on our litigation positions. Now, on the other end, you've got their litigation positions, some of which are very strong. We have to recognize that. I need to interrupt. You're telling me that an ROD is just a negotiating position? I'm saying that the positions we took there were positions we took on those issues at that time. But you end up with an ROD with that number, don't you? We issued a record of decisions that had a number based on the decisions that we made there, yes. And now you're saying you can walk away with it and walk away from it? Is it just a negotiating position? No, we recognize we have a tremendous amount of vulnerability under it, Your Honor. We know we may not be able to pull that off. In fact, in giving this Court's opinion in 84 in Pacific Court, there was a pretty good likelihood we wouldn't be able to pull it off. That one issue alone was going to turn us around for $118 million of benefit. Any appeal from the 20.7 point determination, as you described it, but it was nevertheless a point, wasn't it? That's correct. That would have been appealed to this Court, right? That's correct. And the fact that the IOUs dismissed a week ago their petitions has no bearing on where we were when we had to decide this issue. We had to decide it when we had the settlements in the exchange program. So we had the low end point. Let's talk about the high end point. The IOUs prevail on their positions, which we know are strong, which this Court has shown favoritism toward in the past. So that's going to be a very high rate, 25, whatever it came out to. But instead, what we did, we ran the rate test, credited them the full 72 amounts, $647 million, lowered their rate, went back, looked at the fact that we had this 7G cost of settlement that we had to allocate, and so we allocated that equitably to the other rates, just like 7G says we should do. And that came up, we ended up with a rate that was not the low end and it was not the high end. It was a reasonable rate that accommodated the settlement, and they benefit from a lack of litigation exposure on the exchange. It's not that they don't get any benefit from this, they do, Your Honor. The benefit to the PUD comes in that they aren't bearing their share of the cost of litigating that rate in the Ninth Circuit? And on the downside of losing that litigation, which is going to hurt them. But that litigation, just to make sure I'm still, that litigation you're talking about is the litigation you hypothesized if they were to accept the REP? No, the litigation we're talking about here is 7B2, Your Honor, and that litigation was real. Within 90 days of the final perk order, they sued us on the way we did 7B2, which also has residential exposure. And that was under a different litigation? Yes. If the IOUs had prevailed on a challenge to the 20.7 figure, and arrived at some figure, let's just call it 25 to make it easy, then the PUDs would have had to have shared in the cost of that new rate. Oh, absolutely. Absolutely. If the IOUs are saying, you have been screwing this up for years, you revised the methodology to hurt us in 84, you're doing the same thing over and over, look what you've done to our benefits by violating the law. And they say, okay, I'm sorry, I lost my train of thought. You just kind of thought that triggered me, Your Honor. I'm sorry. I don't know what I asked. It was that the, oh yes, the public, okay. So the IOU's position is that 7B2 shouldn't have triggered at all, you see. So there's no trigger. So there's no amount of the trigger to allocate back as a credit to the preference customers. That's a valid way for the act to work. It has worked that way before. So what happens is the PF rate goes high to pay for those exchange costs. And they pay them. They pay those exchange costs. So if the IOU's are right and there's no trigger, which was a very real threat under this litigation, Your Honor, then they pick up hundreds of millions of exchange costs in their rates. And I'm sorry, just a follow-on question to that. Let's suppose that we disagreed with BPA in this case. How would BPA behave in the future? Does that mean that you would no longer ever settle anything? Does that mean that BPA would end up litigating everything to the death? I think with regard to residential exchange matters, I think that's what would happen. Because it looks a little like a zero-sum game. And so somebody's going to hit you one side or the other, no matter how you decide that, unless you find a point and stick with it and have that adjudicated to the end. Well, we're a business, and so cutting deals is something we have to do to compete and survive. So for residential exchange purposes, this is a very contentious program. And so what we have to do is – again, I'm sorry, I'm very tired. What we have to do is – I'm sorry, I'm tired. I'm losing my train of thought sometimes. I apologize. Okay, we're talking about settlements. Okay, so if we can't do what we did here – we worked so hard because we have these two diversion paths, the REP and the settlement. We have developed rates in this environment we've never seen before. And so that's what we had to do. And here, if we can't do it this way, I do not know of any other way we can have a settlement of the residential exchange program. And we'll have to litigate every 72 exchange issue to the death. The fact that you have preference customers obligate BPA to satisfy all of their needs and then litigate with everybody else in order to hold down rates to the preference customers first. No, there's no requirement like that, Your Honor. All of our customers have their own rates. They're set according to the statutory standards. And contrary to the speculation you heard earlier, there are no secret deals that were cut with the administration. There's no backroom whatever people were alleging about us trying to favor one over the other. What we have done is consistent with the law. And our briefs, I think, explain how we've been consistent with the law. And with that point, I'm really low on time. I have ten minutes to cover two other issues. So I'd like to turn now to the PGP issue on the DSI power sales. And first of all, we raised the race judicata issue in a blasphemy case decided by this court. This court found that these petitioners had sued on whether BPA had authority to sell power to the DSIs. And it also said that BPA violated some rate-making provisions. This court said, we don't have jurisdiction because the petitioners had actual notice of those contracts. They had actual notice that we had done, there had been a big process, big media campaign. The court found that was sufficient. They knew about them. They dismissed the contract claims untimely outside the 90-day limitation. So they also said the rate-making allegations aren't right. Those aren't within 90 days of a FERC order. So we come here. And in there, in that case, they said all those issues, court, are contract issues. Now they're bringing them here. All the issues now are rate-making issues. I intend this not to be a hostile question but to move us along. I think I'm understanding this correctly, that we are in the same position here with Blacksley Lane having been decided by that MemDisco panel, saying that the challenge to the contract was untimely. We're in the same position as if Blacksley Lane had never been decided, and they were now filing a challenge to the contract claims that was untimely. That is to say, or they were filing a challenge to the rate claims. And the question is, in filing a rate claim challenge, can you get at the contract claim that you did not timely challenge? I'm not sure we're in a different position because of Blacksley Lane. They are now filing something that challenges the rates. And as part of their challenge, they're trying to challenge the contracts. And you're saying you can't do it. No, I see what you're saying. It's not a combative question at all, Your Honor. Yeah, no, I didn't intend it to be. Yeah. Yeah. But we had to raise it because we say a lot of their rate-making claims are fine. The FBS claims, they're fine. They have jurisdiction here. We have jurisdiction here. But I don't think they're in any better position or in any worse position for having lost Blacksley Lane. They're just filing late on this one, or they're late at a certain time. And I won't take too much time on this, Your Honor. Part of the problem is that the other claims are they're saying because you don't have authority to sell to the DSIs, with that foundational principle that was in Blacksley Lane, that claim, they're saying you can't sell to the DSIs. That claim, they're saying take that claim, assume it, and now your rates are wrong because you can't sell to the DSIs. That's our argument. I'll move on from that. Because regardless of the race-judicata claim, contrary to what my colleague said, with due respect, we love the court to get into the law here and the statutes. If you go through our brief, I believe it is really set out very clearly about the statutes. First of all, what petitioners are doing in this case is they're trying to combine two different things, preference, which applies to power sales, and rate-making, which doesn't have preference. In three cases, this court has said there's no preference to price. Preference applies to power. So we sold power, all the net requirements they wanted to them. This is the Blacksley Lane case, really, and they're bringing it up here. And they took all they want. After that, we also sold on the last day of the window to the IOUs and the DSIs. So there's no preference problem in terms of our power sales. They're trying to use preference and bring it over into rate-making where it doesn't fit. And that's the problem. That's the fundamental flaw. To say that there's no preference with respect to rate is not entirely true once you look at 7b-2 because there is a cap as to what you can charge your preference customers for the REP program. Your Honor, that's right. What we lay out in the brief is that the only thing they relied on for a preference to price was a citation to legislative history. We walked through it, and where the Congress said preference to price, right below, they said this refers to 7b-2. But 7b-2 is a rate protection device. It's not preference in the same thing that power preference is. It's not your preference. No, it's not, but it does insulate your preference customers. It insulates a class of customers who happen to be your preference customers from an increase in their rates because of the REP program. And we have no problem with 7b-2. Sometimes it helps the public. Sometimes it hurts them. We have no problem with 7b-2. That is what it is. But power sales have preference principles applied. Given the number of applications for power, they have preference over other parties. Preference customers come first before you sell to others. That's not the way rates work. It doesn't apply to rates. This course helps them three times. We cite those cases in our brief. This is, I think, a question coming from ignorance. The 7b-2 cap applies similarly to the REP program. Does it apply to any sales to the DSIs, or is that just irrelevant? The 7b-2 rate test, if it triggers, the trigger amount is allocated to non-preference rates, including the DSIs, Your Honor. Yeah. I think I was asking a different question, but I'm struggling here. Let's assume that you're incurring substantial costs because of your sales to the DSIs. Is there any rate cap in terms of what you can charge back to the preference customers that comes out of 7b-2? I guess I'm a little confused, Your Honor. 7b-2 is a rate step. It's not the final resolution of rates. It's a step in developing rates. And so you do 7b-2, but then you still have to establish the rates after that, if there are costs that you have to recover under Section 7a. So I'm not sure if I fully understand your question. Well, it's not going to be your fault that you're not understanding it. Let me try again, because this is a process of education for me. This is hard going for us amateurs. I understand with respect to the IOUs that with the residential exchange program, depending on how that worked and depending on what kind of rates that might produce, 7b-2 protects the preferred customers from rate increases that might otherwise apply because of the EIRP program. That I understand. That's specifically with respect to rates that are being or benefits that are being given to the IOUs. Okay. But now the question is we're giving benefits to the DSIs. And does 7b-2 have any relevance to figuring out what you do once you've given benefit to the DSIs as you're trying to figure out the rates that you get to charge back to the preference customers? Well, the DSI rate is based by law on the preference rate plus the margin. So whatever helps the preference customers helps the DSIs because of that statutory rate development for the DSIs. And 7b-2 is not relevant to that? Well, 7b-2 is part of what helps set the PF rate. And so the PF rate plus the margin sets the DSI rate. So the DSIs benefit from that as well. I think I understand. Thank you. Okay. I'm sorry. You're right. I wasn't clear. Okay. So the contention, oh, I'm running. So please, please, I urge the Court to read our briefs on the issues regarding the DSIs. BPA did it exactly by the book. BPA sees what its loads are and then it acquires resources to meet those loads and then it allocates the cost of those resources to rates. So we had loads. We needed resources. We went out and acquired FBS replacement resources, which we're allowed to do within our discretion. We had the FBS pool. Then we allocated costs to the rates. There's nothing wrong with that. We went by the book. There's no violation of preference. And our brief on this section goes through every single issue with the law, refuting point by point every argument that was made by petitioners. So I really urge the Court to review the brief on that. Turning now to the fish and wildlife. I only have about two and a half minutes. First, BPA. Let me say that BPA did recover all of its costs, including fish and wildlife costs and rates. BPA asked the three sovereigns, a group comprised of the tribes, a number of tribal groups, representatives of all four states, and about ten different federal agencies involved in fish and wildlife matters, a group that exists by MOA, which said, We have a rate case coming up. Can you please get together and tell us what our fish funding alternative should be so we know what to include in the rate case? So this was where the fish funding was going to be established so we could take it and go into the rate case with it. So the group met for nine months, hammered things out, came up with 13 fish funding alternatives. These alternatives ranged from about $437 million a year to $724 million a year for fish. Now, BPA set rates to recover its total system costs, and here's why they do. BPA started the rate period with $429 million in reserves. Its rates, including the automatic load-based and financial-based cracks, recovered the full range of fish and wildlife costs from $437 to $724 a year, the full range, without even using our additional SM crack, safety net crack. So not only did we cover the full range, we had another adjustment clause to cover more. On top of that, we had an 80 to 88 percent Treasury payment probability. And Treasury is the last payment we make under law. We pay all of our costs, including fish costs, before we pay the Treasury. So with 80 to 88 percent Treasury payment probability, we're going to probably make our Treasury payment. And also, BPA forecasted ending reserves for the rate period in 2006 at $1 billion. We prepared ourselves for the next rate period, being able to be in good shape to do full funding of fish and wildlife at that time. Also, what we said, the issue about not providing them an opportunity to revisit the free sovereigns process, well, that makes a lot of sense. We had a separate process outside the rate case, as we do for all budget levels. Budgets aren't set in the rate case, and for fish and wildlife in particular. In the rate case, it's an adversarial proceeding. Parties that have an interest can't get around a table and work out what they think the right cost should be. That's what's done in these budget meetings. The free sovereigns process, nine-month expansive process, came up with these. And they said, here's what you should use. We said, yes. The fish and wildlife people said, no, toss out what we agreed to and go with our two high-cost alternatives. We said, that's not appropriate. Before you sit down, I know that Mr. Wood is very anxious to get here, and I'll let some additional time be given to him if necessary. I'm sorry. The question is, how does resolution of our Monday cases affect the resolution of this case? Well, contrary to what Mr. Mundorf said, these are two separate cases. Contracts rise or fall on their merits. If they're lawful, they're valid. Here we're talking about the rates that apply to the contracts. So you treat them as two separate? Under the Northwest Power Act, contracts are specified as one final action, expressly listed. Rates are a separate final action. So these are two entirely separate matters. Now, they're related, of course, because the rates are used in implementing the contracts, but they're two separate final actions. Don't worry, Mr. Wood. As a hypothetical, what if we hold that those contracts on Monday were illegal? Then what happens to this case? Anything? If those were illegal. If those were illegal contracts. Those are illegal. The Portland General case. So if we couldn't have the settlement agreements, well, then we have to go back and determine what the benefits should have been under the exchange for the investor-owned utilities. If we had been doing it, if we had done what we were going to do, which was to revise the AFC methodology during that five-year period, we had announced publicly we were going to do that. We didn't do it as a result of the settlement, but that is likely to increase the benefits. We have to rerun the rates and see what the effect of that would be. We calculate what their benefits would have been either under an alternative settlement or under the residential exchange program. And we know the range of that can be tremendous, Your Honor. Thank you, Kevin. Thank you very much. All right. We'll give you five minutes. Thank you very much, Your Honor. Marcus Wood, again, representing Pacific Corp, representing on behalf of the Northwest Investor-Owned Utilities. As we've discussed both Monday and today in referring to the residential exchange and what our residential and small firm customers are entitled to, we are talking about a range of potential benefits. The fact that there is a range and a contingency is exactly what makes this calculation so contentious. The question was asked by Judge Fletcher, I think, opening up, is why would Bonneville be so generous to these IOUs and their residential and small firm customers as opposed to preference customers? And I suggest that the reason is that, and this is our perspective, that for years, beginning in 1984, we believed that Bonneville, precisely to keep its preference rates low, had consistently cut back in various interpretations on what our residential and small firm customers were entitled to, and we believed they had exceeded the discretion allowed them under law. There were large and very serious claims that were ripe for adjudication, and Bonneville could decide to adjudicate them or could decide to attempt to settle them. When you say for years, do you mean for years subsequent to the passage of the Northwest Power Act? For the years subsequent to the passage of the Northwest Power Act. And so the contention is always surrounding that REP program? It's always been, beginning in 1984. There wasn't contention until Bonneville started cutting back the benefits in 1984. The exchange benefits that have been discussed rely on BPA's most aggressive interpretation of what those benefits should be. On the other hand, we presented why we believed that those benefits should be at least $300 billion a year higher. Those items were, in fact, addressed and quantified and discussed in the sections of the Record of Decision in the Mundy case that I provided to you at the end of the day, beginning, I believe, at page 803, where the nature of each of those disputes and the amounts were quantified. I want to make a contrast here. The publics have claimed that by settling these claims and recovering the costs, that they paid over a five-year period an additional $292 million in settlement costs, less what was saved by Bonneville not having the exchange. We don't know that number. By contrast, the amount of the claims exceeded $1.5 billion over that same period. Bonneville settled these claims with us for less than 50 cents on the dollar. Another question was asked, what would have happened had there not been a settlement offer? How would we have brought the claims? I actually do not believe the result would have been that we entered the residential exchange and brought the claims. I believe we would have brought an appeal to what Bonneville offered us, claiming that it was not what the law required Bonneville to offer us, and that claim would have been adjudicated. It should also take note of what happened to the claims that were actually filed. Adjudicated by whom? This court. Then whatever amount it was would have been paid by the PUDs? By the PUDs. The other question is what happened to the claims in this court. We did appeal the determination of Bonneville in the 7B2 test. I don't think it should be terribly surprising that a party that wants us to settle for less than 50 cents on the dollar would take a tough position in its record of decisions. It's not likely to offer a settlement and say, if you don't take the settlement, I agree with you on a lot of your issues. In any event, we did appeal. We agreed with Bonneville last week. There's a system where you make a claim, they settle, and the third party pays whatever they settle for. Bonneville makes rates. It enters contracts all the time and determines costs, and what those costs are, whether the power sales, power contracts, whatever, wind up as part of their revenue report. Whatever they settle for doesn't cost them a dime. It only costs the PUDs, doesn't it? All of Bonneville's costs have to be passed through and recovered by their customers. Likewise, if they choose to litigate and lose, it costs their customers. So would the IOUs have paid a part of the settlement cost that would be going to them in a lump sum? It would actually be going to you in the form of the settlement. I think it's fairly clear that if we settle for a given amount of money, we can't be charged back the cost of the settlement or there won't be a settlement. If Safeway has to flip and fall in the green bean section and pays out a cost there, it can raise the cost of green beans, and that goes to everybody, including the guy who flipped and fell in the green bean section. Indirectly, if we were to have litigated and the question is, what do you net out after the portion is allocated to you? Our claim was that what our customers entitled to net out exceeded $300 million. You're saying then that an adjustment to the rate was already included in the settlement itself. That is correct. And the only other thing I want to mention is what happened to the appeal. Last week, we agreed with the Bonneville Power Administration that because the settlement was still in effect, the issues were not right. Bonneville agreed that if we withdrew, the withdrawal would be without prejudice and without the 2000 determinations being precedent in future Bonneville rate proceedings. We agreed to do that and still inform the court, and it was dismissed because these issues are not right with the settlement in effect. It may or may not prove to be relevant to our decision, but I think it would be useful for us to have the documents associated with that dismissal. We'll be happy to provide them now. It may or may not prove to be relevant, but it might be useful to have. We would be delighted to provide them. Thank you. Thank you. I approach the podium with some trepidation, but only to respond to Judge Fletcher, and perhaps if I'm fortunate, Mr. Johnson will see me two minutes that he doesn't have to two or three points that Mr. Cassatt had. We have a copy of the order that you just spoke about, Your Honor. We'll give it to your clerk if you have that. You asked for the date of the record of decision. That was the May 2000 record of decision, so I was fairly close on that one. You asked for what would have the rate been, and by rate that was poorly phrased, what would have been the rate that was produced by application of the Section 72 rate ceiling had the investor and utilities positions prevailed or Bonneville had not found them to lack legal merit. I took from page 108 of Bonneville's brief their estimate of that number, and it was 23.2 mils per kilowatt hour. So those, I believe, are the three questions. But if that's true, then Bonneville settled this above what the IOUs were claiming. That would make any sense. Wasn't the, I'm sorry, 23.2 and the rate was, oh, I'm sorry, 23.3. It was above. Yeah, you transposed the numbers. I'm sorry. Can you say that one more time? Yes, I will. I'll give you all the numbers. That maybe would be the most sensible way to do it. Their original calculation, Bonneville's original calculation of the rate ceiling limit based on Bonneville's assumption was 20.7 mils per kilowatt hour. That is the number they ultimately in their record of decision adjudicated to be the correct number. Bonneville added to that number the cost of the REP settlement and produced 22.3 mils per kilowatt hour, which is the rate they actually charged us. And the IOUs, had they prevailed with their issues in the rate ceiling calculation, that would have produced a rate of 23.2 mils per kilowatt hour. I believe I got all those numbers right and didn't transpose anything. Where does that last number come from? I got that from page 108 of Bonneville's brief. It may appear other places, but that was the most convenient place for me to look. Page 108, 23.26. Yes, I rounded it. I rounded it down. I was trying to give him a break. Okay. If you would indulge me, Professor, I'd like to speak to three very quick points that Mr. Cassatt made. He indicated that Bonneville came into the rate case. It had settlement costs for settling the REP. It caused a conflict with 7A. They had to do something about it. Unfortunately, that's factually incorrect. The rate case that we're talking about concluded in May of 2000. The REP settlement contracts were not signed until October of 2000, so clearly it was a desire to pay money rather than an obligation liquidated, so that would be factually wrong. The second point is in response to a question that you asked, Judge Fletcher, about whether Bonneville has ever applied 7G in the manner that they are proposing that they have done in this case. I think the answer that you got was, well, we've never had these circumstances before. We've never had settlements that spanned various rate periods. I do not believe that's correct. In the Mundy argument, it was noted by Bonneville many times that they've had settlements, particularly with Snohomish PUD, that spanned 13 years back to 1987. Since 1987, the rate ceiling has triggered, has gone into effect in 1987, 1991, and 2001. Same circumstance we have now. In none of those cases did Bonneville have to seek recourse to Section 7G, and the reason they did not is because those settlements were constructed to take into account a potential trigger of 7B. The consequence is those settlements conform with the statute. This settlement does not. One last question, then I will sit down and we can all have lunch, which we probably all need. That was the question of, if this case plays out the way the publics want it, will Bonneville ever settle again? My answer is exactly opposite to Mr. Cassatt's. Yes, they will. They will because Bonneville knows and has in the past constructed settlements that conform with the statute, settlements of benefits. They put 40 of them in the record. They're sitting there for you to look at. Nobody sued on them, and the reason nobody sued on them is because no one reached the conclusion that their statutory rights had been trampled on. This case is different. This settlement requires Bonneville to operate in a way that abridges statutory rights, particularly Section 72 and 3. And I apologize for taking the time, but I appreciate your attention. I have one minute. I've got substantial questions. I'm going to respond to just one remark from you about Bonneville. All right. One minute. I'll start talking before I get up. No, don't, because of the microphone. I plan an astounding statement by Bonneville to say that the tribes came in willy-nilly and arbitrarily and said, throw out all this other stuff we did and let's do something else. He fails to tell you that at the time that occurred, at that point, we had a biological opinion issued by the National Fisheries Service on what was needed to be done, and the circumstances had changed substantially. We came in and said, the circumstances have changed substantially. You need to do something different. Bonneville said, oh, no, we excluded that before, and we're excluding it now. Last point. Bonneville says, oh, we did our crack, and we recovered all our costs and everything else. The fact of the circumstance is, in 2001, we had the worst drought ever. Those of you from California remember what happened to rates. Well, what Bonneville did in that year, contrary to what BPA says, they stopped all spill in the Columbia River, which was a provision of the Fish and Wildlife Plan and a provision of their fish and wildlife costs, and ran all the fish through the turbines and never provided any money following that for any of these things that BPA says they did. That's how they treated the way that they met their treasury costs was they deprived fish and wildlife of any spill and devoted the money to paying their treasury costs. That's how they were treated. Thank you. I'm afraid we've got all good things have to end sometime. Well, I know that the procedure here is one side, then the other, then a rebuttal. And that's the way we go. So we've got another one of these cases. Maybe you can slip it into the next case. Case history will be submitted.
judges: Reinhardt, W. Fletcher, Bybee